St. Louis, Iron Mountain & Southern Railway Company *v.* Duckworth.

Opinion delivered June 14, 1915.

1.    License—Invitation—When 'Inferred.—An invitation may be inferred where there is a common interest and mutual advantage, while a license is inferred where the object is the mere pleasure or convenience of the person using it.

2.  MASTER AND SERVANT—PATH BY RIGHT-OF-WAY—INVITATION BY MAS-
TER.—Where it was for the benefit of both a master and servant
for the latter to use a certain foot path by the master's right-of-
way, and when the same had been so used for five years, and that
fact was known to the superintendent of the master, it will be held
that there was an implied invitation by the master to the servant,
to use the path.

3.  NEGLIGENCE—PROXIMATE CAUSE OF INJURY—RULE.—In order to war-
rant a finding that negligence is the proximate cause of an injury,
it must appear that the injury was the natural and probable con-
sequence of the negligence, and that it ought to have been foreseen
in the light of the attending circumstances, but it is not necessary
that the particular injury which did happen, should have been
actually foreseen.

4.  DAMAGES—PERSONAL INJURY—AMOUNT.—Where plaintiff was so se-
verely injured by reason of the negligence of defendant railroad
company, that one leg had to be amputated, and where he suffered
great pain by reason of the injury, a verdict of $7,000 will not
be held to be excessive.

Appeal from Bradley Circuit Court; *Turner Butler,*
Judge; affirmed.

STATEMENT BY THE COURT.

R. W. Duckworth sued the St. Louis, Iron Mountain
& Southern Railway Company to recover damages for
personal injuries sustained by him while in its employ-
ment.   He was employed by the railway company as a
mechanic and worked in its shops at McGehee, Arkansas.
The shops at McGehee are situated 150 or 200 yards
southeast of the passenger depot and are on the east side
of the main track.   About 150 men are usually employed
at these shops and there is a passageway across the track
for them to use in coming to their work.   The plaintiff
lived on the east side of the tracks and about a quarter
of a mile away.   There was no practical way for him to
go from his home to the shops on the east side of the
tracks and he, as well as all other employees living in that
part of town, was accustomed to walking along a beaten
path on the right-of-way on the west side of the railroad
track when going to or returning from their work.   The
residents of the town of McGehee were also accustomed
to walking along this same path.   About 6:30 o'clock on

the morning of the 20th of January, 1914, while the plaintiff was walking along the path on the west side of the track a wire attached to a passing train became fastened to one of his legs and he was dragged along about forty feet by the moving train. The wire then broke loose from the train and the plaintiff fell under the train. The wheels of the train ran over one of his feet and crushed it so that his leg had to be amputated. The employees had been using the path along which the plaintiff was walking since some time in 1909, and the testimony on the part of the plaintiff tends to show that the path was so used with the acquiescence and consent of the railroad officials; that the car of the superintendent was often on the sidetracks and that he could see the employees going to and from their work along this path. The testimony on the part of the plaintiff also tends to show that a great many logs were shipped into the station at McGehee and that the logs were wired to flat cars in which they were hauled and that these wires were from thirty to one hundred feet long; that it was the custom when unloading these logs to cut off one or both ends of the wires and to then place the wires back on the flat cars. Frequently loose wires, all curled up, were left lying along the track in the company's yards at McGehee. Flat cars were also frequently seen in trains on the main track at McGehee with wires attached to them and dragging along by the side of the car. Other facts will be referred to in the opinion. The jury returned a verdict for the plaintiff and the defendant has appealed.

E. B. Kinsworthy, James C. Knox and T. D. Crawford, for appellant.

1. Appellee was a bare licensee to whom the appellant owed no affirmative duty of care to avoid injuring him, but only to avoid wantonly or wilfully injuring him. 95 Ark. 190; 103 Ark. 226; 114 Ark. 218.

2. The master's duty in respect to furnishing his servant a safe place in which to work extends to such parts of his premises only as he has prepared for the ser-

vant's occupancy while doing his work. The appellee in this case was not engaged in appellant's work when he was injured. His employment called for work in the shops and yards, not upon the main line. It was not necessary for him to follow the path in going to his work, neither was it appellant's duty to make the track in question safe for his use as a pedestrian. 115 Ark. 350.

3. The court should have directed a verdict for appellant. There was no reason why appellant should have foreseen this accident. One who goes close to a passing train does so with knowledge that if there is anything protruding from any of the cars it is likely to injure him. Appellee assumed the risk and was guilty of contributory negligence in being so close to the passing train. 90 Ark. 387.

4. Appellee was fifty-seven years of age, earning $600 per year, and there was no assurance that at this age he could continue earning this amount. The verdict was excessive.

*Murphy & McHaney,* for appellee.

1. It is not necessary, in order to make appellant liable, that the particular injury complained of, in the particular manner in which it occurred, should have been foreseen or anticipated, but only that it might have been anticipated by the exercise of ordinary care, that some injury was likely to occur as a result of the negligence complained of. 4 L. R. A. 420; 97 Ark. 585.

2. Appellee was not a mere licensee, and the cases relied upon by appellant to support this contention do not apply. One who goes upon the premises of a railroad company upon business connected with the company or on business of mutual benefit to himself and the company, is not a licensee, but is there by invitation. 69 Ark. 489; 48 Ark. 491; 90 Ark. 278, and cases cited; 30 N. W. (Mich.) 337; 196 Mass. 575; 80 N. E. 705; 168 Mass. 261, 47 N. E. 90; 18 N. Y. 432; 27 Jones & S. 367; 126 Fed. 194; 30 S. E. 437; 52 Am. Rep. 279; 36 N. W. 591; 14 Am.

Rep. 32; 44 N. W. 270; 39 N. E. 493; 41 S. C. 468; 29 S. E. (N. C.) 784; 36 S. E. (S. C.) 700; 104 Ark. 236; 89 Ark. 103; 96 Ark. 642; 94 Fed. 323; 99 Ark. 491.

3. The verdict was not excessive. Appellee's earning capacity, about $786 per year, was not alone to be considered, although that alone justified the size of the verdict, but his extreme pain and suffering, both mental and physical, he has undergone and will continue to undergo, were also proper elements to consider.

Hart, J., (after stating the facts). It is insisted by counsel for the defendant that the testimony is not sufficient to support the verdict; that the facts in this case do not bring the plaintiff within the well known rule that it is the master's duty to use ordinary care to furnish safe appliances and a safe place to work to his servants and to exercise the same degree of care to keep such appliances and place in the same condition. They contend that the duty of an employer to provide a safe place to work is limited to the place where the employee is required to be for the purposes of his employment. They rely upon the theory that the defendant was not bound to anticipate the presence of the plaintiff at the particular place where the accident occurred, on the ground that he would not have been there had he gone the usual way provided for him in going to and from the shops. In short, they urge that the duties of the plaintiff in the performance of his work did not require him to go along the path where he was injured, that he was there without any invitation or any inducement therefor by the railroad company; that he was, therefore, at most a mere licensee; that a licensee takes his license subject to all its concomitant perils; and that the licensor owes him no duty except to refrain from wilfully or wantonly injuring him and to exercise ordinary care after discovering him to be in peril. See *Chicago, Rock Island & Pacific Ry. Co.* v. *Payne,* 103 Ark. 226, and cases cited; *St. Louis, I. M. & S. Ry. Co.* v. *Tucka,* 95 Ark. 190.

We do not agree with counsel in this contention, and do not think the facts in this case bring it within the prin-

ciples of the cases above cited, and other cases decided by this court with reference to the duties of a railway company to mere licensees. There is a difference between invitation and license, and an invitation will be more readily implied in some cases than others. To illustrate, the undisputed facts in this case show that the accident occurred in 1914, and that the residents of the town as well as the employees at work in the shops had been accustomed to use the beaten path along the west side of the railroad track for more than five years and that the officials of the company knew of this fact but made no effort to prevent them from using the path. Under these circumstances a resident of the town would be a mere licensee for the reason that he used the path solely for his own pleasure and convenience.

It is conceded by counsel for the defendant that if the railroad company had provided this path as a means of egress or ingress for its employees to its shops that it would be the duty of the company to use ordinary care to keep it in a safe condition. But they contend that under the facts in this case the plaintiff had no greater rights there than the residents of the town and that he should be treated as a licensee merely.

(1-2) An invitation may be inferred where there is a common interest and mutual advantage while a license is inferred where the object is the mere pleasure or convenience of the person using it. As we have already seen, the undisputed facts show that the servants had been accustomed to walk along this path in going to and from their work in the shops for a period of more than five years before the accident in question occurred. The evidence also tends to show that there was no practical way to go from the part of the town where the plaintiff lived to the shops on the east side of the railroad. The record does show that there was a street on the west side of the railroad nearly parallel with the tracks of the railroad company which the plaintiff might have used in going to and from his work. But it appears that much hauling was done over this street and that it was cut up

with ruts and very muddy, which made it very difficult for footmen to travel over it.  The beaten path used by them enabled the shopmen to reach their homes more quickly and to return to their work more promptly.  It was the most direct and practical way to reach the shops from that part of the town where the plaintiff and many other employees of the defendant lived.  The railroad officials, including the superintendent of the road, saw them using this path for that purpose day after day and acquiesced therein.  While there was no express designation that this path be used by the servants in going to and from their work at the shops we think the jury might have inferred an implied invitation to so use it.  Such use of the path was for the common interest of both the railroad company and the plaintiff for the reason that the railroad company was interested in its servants getting promptly to the shops where they worked.  Under the circumstances, we think it can not be said that the plaintiff was walking along the path where he was injured solely for his own convenience; but we are of the opinion that he was rightfully there upon the implied invitation of the company.  See *St. Louis, I. M. & S. Ry. Co.* v. *Schultz,* 115 Ark. 350; *St. Louis, I. M. & S. Ry. Co.* v. *Wirbel,* 104 Ark. 238.

(3)  The jury might have inferred that the negligence of the railroad company in regard to the wires was the proximate cause of the injury.  In order to warrant a finding that negligence is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence, and that it ought to have been foreseen in the light of the attending circumstances, but it is not necessary that the particular injury which did happen should have been actually foreseen.  See *Pulaski Gas Light Co.* v. *McClintock,* 97 Ark. 576.

In this connection it may be said that the testimony on the part of the plaintiff shows that wires from thirty to one hundred feet long were frequently seen in the yards of the company at McGehee, where the injury in question occurred, and that such wires were frequently

seen attached to moving cars going out from the station at McGehee. We call particular attention to the following testimony:

"Q. What would become of the wires (referring to wires on flat cars after logs were unloaded)? A. I have seen them cut off; they have stakes on each side of the cars, and they run the wires backwards and forwards, three or four strands to the stakes, and then they take a stake or a rod and put it in between the wires and twist it until it is tight, to hold the logs on there; and when they get ready to unload them they just cut one side of the wire and throw the wire around; the wire hangs to the stakes on the other side, which has not been cut—then they unload the logs. Q. Have you ever seen any of those wires that were thus used in wiring on logs, lying anywhere about the main track? If so, where? A. Yes, sir; I have seen them practically all over the yard and along the main line, and I have seen flat car after flat car with wires to the stakes, and also lying loose upon the cars. Q. Have you ever seen any lying loose on or about the roadbed or track of the main line? A. I have seen them lying there from the main line about a mile or two north and south of McGehee. Q. All along? A. Yes. sir; all along wherever I have traveled. Q. Do you know anything about the underworks or attachments on passenger cars? A. Yes, sir. Q. Do you know anything about their catching up wires left on the track? A. All the brace rods under the cars lie very low next to the track; the brace rods, the long rods that go from one end of the car to the other—and they have a plank in between them. I suppose from six to eight inches wide; the rods are very close to the surface, about a foot and a half, something like that from the ground, or probably two feet."

Objections are made by counsel for the defendant to certain instructions given by the court at the instance of the plaintiff and to the refusal of the court to give certain instructions asked for by them. We do not deem it necessary to set out these instructions or to comment

upon them for the instructions given were in accord with the principles of law above announced and the questions of fact were submitted to the jury under appropriate instructions.

(4) It is finally insisted by counsel for the defendant that the verdict of the jury is excessive. The jury found for the plaintiff in the sum of $7,000 and we do not regard this amount as excessive under the circumstances of the case. The plaintiff's foot was crushed by the cars running over it; his leg was torn open six or eight inches on the calf and about half way from the knee joint. His foot was first removed by amputation and after he had been in the hospital three or four days a second operation was performed and his leg cut off just below the knee. He was compelled to stay in the hospital four months. During all this time and for a considerable time since he has suffered severe and excruciating pain. His physician testified that, though he could not state positively that the pain and suffering of plaintiff would be permanent, he believed it would last during his life. The plaintiff at the time he was injured was earning between six and seven hundred dollars a year. He was a stout, able-bodied man, was sober and industrious and his earning capacity was likely to be increased. When this is considered, in connection with the severe pain which he endured, and is likely to endure, we do not think that a verdict of $7,000 is excessive.

The judgment will be affirmed.

KIRBY, J., dissents.