## NEW UNION COAL COMPANY *v.* SULT.

### Opinion delivered January 31, 1927.

1. MASTER AND SERVANT—SAFE PLACE TO WORK.—A mine owner owes to its employees in its mine the duty to use ordinary care to furnish a safe place to work in and keep the place in a safe condition.

2. MASTER AND SERVANT—SAFE PLACE TO WORK.—The owner of a mine is bound to exercise ordinary care, even if props have not been demanded, to discover the condition of the mine, and, even if props have not been demanded, to discover the condition of the roof and to keep same in reasonably safe condition for its employees to work in the mine.

3. MASTER AND SERVANT—SAFE PLACE TO WORK—EXCEPTION TO RULE. —The rule that a mine owner owes his employees the duty to use ordinary care to furnish a safe place to work in is subject to an exception where the injuries result from changed conditions brought about by the servant in the course of his work.

4. MASTER AND SERVANT—SAFE PLACE TO WORK.—In an action by a coal loader in a mine for injuries sustained by a rock falling through a roof of the mine, alleged to have been caused by a crack in the roof or by defective propping, defendant was under the duty to furnish plaintiff a safe place while engaged in his

work; plaintiff not being required to inspect the roof to see if it is safe for him to begin work.

5. MASTER AND SERVANT—SAFE PLACE TO WORK.—In an action by a coal loader against a mine operator for injuries sustained by a stone falling through the roof of the mine, evidence showing that the fall was caused either by an old break in the roof or a defective propping due to negligence of fellow-servants *held* to sustain a recovery by plaintiff.

6. MASTER AND SERVANT—NEGLIGENCE OF FELLOW-SERVANT.—Where it was the duty of machine operators in a mine, who cut the ground under a vein of coal, to prop the roof to make working conditions safe for loaders who were to follow them, failure of the operators to perform their duty constituted negligence on the master's part.

7. MASTER AND SERVANT—SAFE PLACE TO WORK.—In an action by a loader in a coal mine for injuries from a rock falling from a roof insufficiently propped, the fact that the rule requiring the machine operators to prop the roof was adopted under a contract between the employer and the employees, and not under a rule voluntarily prescribed by the employer, does not relieve the employer from liability for the negligence of the machine operators.

8. MASTER AND SERVANT—DUTY TO MAKE RULES.—The operator of a coal mine owes to its employees the duty of making rules necessary to insure the safety of employees, and to inform the employees of such rules.

9. MASTER AND SERVANT—INDEPENDENT CONTRACTORS.—Machine operators employed by a mine owner, subject to its control as to the manner of doing the work, are not independent contractors.

Appeal from Logan Circuit Court, Northern District; *James Cochran,* Judge.; affirmed.

### STATEMENT OF FACTS.

This action was instituted by John E. Sult against the New Union Coal Company to recover damages for injuries received by him by a rock falling from the roof upon him while working as a loader in a coal mine.

The negligence alleged is that the defendant permitted its mine roof, in the room where the plaintiff was at work loading coal, to become unsafe. The negligence alleged is that the defendant failed to properly cap, brace and prop the roof of the mine at the place where the plaintiff was working. The defendant denied the allegations of the complaint, and pleaded assumed risk.

At the time of his injury, on October 15, 1923, John E. Sult was an experienced loader and was a member of the United Mine Workers, District 21. There was a contract between District 21 and the New Union Coal Company. The contract provided that the machine crew shall be composed of two men. Another paragraph of the contract reads as follows: "It shall be the duty of the machine crew to undermine the coal, mining same as near bottom of coal as practical; all machine cuttings and other dirt created by the operation of the machine shall be moved by the loader, leaving the place cleaned up ready for the machine, and removing all such dirt to a distance of not less than four feet from face of coal and five feet from the roadbed. If the loader leaves any excess dirt, the company shall clean up same, charging such expense to the loader leaving said dirt. It shall be the duty of the machine crew to set such props and sprag such coal as may be necessary to make the roof reasonably secure and safe immediately after the coal has been cut."

Under the head of "Rules for Loaders," we copy the following: "It shall be the duty of the loader to build packwalls, remove coal sprags to drop the coal, and set such permanent props to make the place safe as shall not impede the operation of the machines. He shall also set temporary props to make the place safe prior to the operation of the machine. He shall also clear his place of all draw slate and clod prior to the operation of the machine.

"Note: In case any loader does not clean up the place in which he is working, as prescribed in the above paragraphs, the company shall clean up the same at the expense of said loader."

The length of the block of coal in the room where the plaintiff was working when injured was fifty feet, and the vein was about twenty-eight inches thick. A machine operated by two men is used to cut away the earth at the bottom of the vein of coal. The idea is to cut as near the bottom of the vein of coal as you can without cutting the

coal itself. When the machine cuts under the coal, it sometimes cuts in the coal and sometimes the earth underneath. Sometimes it cuts a little in both. The ordinary depth of a cut is about thirty inches. The machine cuts the earth and the coal for a depth of from two to four inches, and the machine crew leaves the dirt, muck and coal from the cut on the floor. Sprags are then placed in the opening to hold up the vein of coal. A "sprag" is a piece of timber used as a prop. As soon as the cutting in the face of the coal is made by the machine, props are placed on the floor of the mine extending to the roof to hold it up while the coal is being mined and loaded in the car. It is the duty of the machine operators to set the props about three feet apart and about four or six inches from the face of the coal. They take a capboard and rake away the cuttings and set the props on the solid bottom of the mine. It is made tight with capboards. Sometimes capboards are placed both on top and beneath the props. The props are wedged in tight to hold up the rocks in the roof of the mine and to keep the coal from knocking them over when the sprags are pulled out by the loader for the purpose of allowing the vein of coal to fall down. When the loader goes in the room for the purpose of loading the coal, it is his duty to clean up after the machine crew. He takes the cuttings and piles them up against the props where they had been placed by the machine operators on the previous trip. The "gob" is a space between the face of the coal and where the props had been set by the machine operators on the previous trip. It would be about thirty inches wide and between thirty and thirty-four inches high. When the loader goes into the room, it is his duty to place the cuttings from the machine, which consist of earth, muck, rock and coal, into the part of the gob opposite the face of the coal. In other words, it is piled into a wall on the opposite side of the gob from where the loader is working. So, too, it is the duty of the loader to pile up any props that may have been left by the machine men. When this has been done, he begins his work as loader. He accomplishes this by

pulling out the sprags so that the vein of coal will fall down and break into pieces on the floor of the gob. The loader then puts the coal in a car.

The plaintiff had loaded all the coal on the right-hand side of the room before he was injured. When he commenced to work on the left-hand side, he pulled out the sprags, and this caused the vein of coal to fall down. A large rock in the roof of the mine fell upon the plaintiff, knocking him down and seriously injuring him. He was rendered unconscious for a time. The rock in question was about five feet long, three feet wide and seven inches thick at one end. It tapered off to a feather-edge of the end of the rock near to the gob wall. The thick end of the rock was near to the face of the coal where the plaintiff was working. There was evidence adduced by the plaintiff tending to show that there was an old crack in the rock next to the gob wall. The evidence for the plaintiff also showed that the props where he was working were set in a negligent manner by the machine operators. The evidence on this point will be stated more fully under an appropriate heading in the opinion.

The evidence for the defendant tends to show that there was no negligence on its part whatever.

The jury returned a verdict in favor of the plaintiff in the sum of $1,000. From the judgment rendered the defendant has duly prosecuted an appeal to this court.

*White & White* and *Evans & Evans,* for appellant.

*Dave Partain* and *G. L. Grant,* for appellee.

HART, J., (after stating the facts). Inasmuch as the main reliance for reversal of the judgment is that the evidence is not legally sufficient to support the verdict, it may be well, at the outset, to restate the settled principles of law which control cases of this sort. A mine owner owes to its employees in the mine the duty to use ordinary care to furnish a safe place to work and to keep the place in a safe condition. *Central Coal & Coke Co.* v. *Charles;* 122 Ark. 401, 183 S. W. 969.

In *Bauschka* v. *Western Coal & Mining Co.,* 95 Ark. 477, 129 S. W. 1065, it was held that the owner of a mine

is bound to exercise ordinary care, even if props have not been· demanded, to discover the condition of the roof of the mine and to keep same in reasonably safe condition for its servants to work in.

There is an exception to the general rule where the injuries result from changed conditions brought about by the servant in the course of his work. *Moline Timber Co.* v. *McClure,* 166 Ark. 364, 266 S. W. 301.

It is first contended that the safe place doctrine is not applicable in the case at bar, because the plaintiff him-self was creating the danger during the progress of the work. It is the contention of the defendant that it was the plaintiff's duty, before beginning work, in order to satisfy himself that the room was a reasonably safe place in which to do his work, to inspect the roof, and that it was also his duty to inspect it, if it became dangerous in the progress of the work. On the other hand, the plaintiff contends that his only duty was to make a casual observation to see if any thing was wrong with the roof, and that he was under no duty to make any test for the purpose of discovering any defects in the propping.

According to the evidence adduced by the plaintiff, the machine operators first enter the room with their machine and cut the ground under the vein of coal for about thirty inches. The vein of coal in question was about twenty-eight inches in height. The machine, as it cuts, cleans out three or four inches of dirt and coal and enters into the face of the coal about thirty or thirty-six inches. When the cutting is made, it is the duty of the operators of the machine to put sprags in the openings thus made for the purpose of keeping the vein of coal from caving in. When this is done, it is also their duty to place props from the bottom of the mine to the roof about three or four inches from the face of the vein of coal in order to keep the roof from falling in while the loader is at work. It is the duty of the machine operators to put in as many props as are necessary to make the roof safe. Then the machine is removed from the room, and the place is ready for the loader.

It is the duty of the loader to remove the muck, dirt, coal and rock taken out by the machine in making the excavation under the vein of coal. All this waste material is piled up by the loader on the wall opposite the vein of coal. It is also the duty of the loader to remove or pile up any props which have been left by the machine operators. It is not his duty, in any wise, to inspect the roof of the mine to see if it is safe for him to begin work. After a loader has loaded the coal into the car, it is his duty to inspect the roof and put in new props if necessary, in order to make the place safe for the machine operators to come into the room and make a new cutting or excavation under the face of the vein of coal.

Thus it will be seen that, according to the evidence for the plaintiff, it is the duty of each set of employees to put in props and leave the place safe for the servants who succeed them in the work. In short, it is the duty of the machine operators to prop the roof for the loaders and it is the duty of the loaders to see that the roof is made safe for the machine operators when they come in again.

When the plaintiff attempted to remove the sprags under the vein of coal, the roof fell in, and the plaintiff was seriously injured by a large rock falling on him. According to the evidence adduced by the plaintiff, there was an old break in this rock which might have caused it to fall, and it was also inferable that two of the props had not been properly put in and that this caused the roof to cave in when the plaintiff pulled out the sprags; or the falling of the rock might have resulted from both these causes.

When it is kept in mind that the plaintiff was under no duty to examine or inspect or prop the room until after he had finished loading the coal, it is difficult to see upon what ground the defendant did not owe him the duty of keeping the room in a reasonably safe condition. Mining, under the most favorable conditions, is a hazardous business; and, under the evidence for the plaintiff, after the excavation had been made, it was the duty of the machine operators to prop the roof in order to make it safe for

the work of loading which was to be done by the plaintiff. All that was required to make the room safe for the loaders was to properly prop it. With this the plaintiff had nothing to do. It was the master's duty to exercise ordinary care to do this, or to see that it was done by the machine operators who were engaged for that purpose. If the machine operators failed to do their duty in propping the roof, it was the negligence of the defendant.

A brother of the plaintiff testified that he went to the place where his brother had been injured, and that two of the props had fallen down. From the appearance of the ground it looked like the props had been set on top of the cuttings and that the props had slid out in that dirt. It will be remembered that the undisputed proof shows that it was the duty of the machine operators to clear away the machine cuttings and to set the props on solid rock, or on a cap placed on solid ground. It is necessary to wedge in the props tightly in order for them to hold up the roof of the mine when the sprags are pulled out and allow the vein of coal to drop down. Again, Burt Crumpton testified that he made an examination of the place where the plaintiff had been injured, and could tell where the props had been set, from the appearance of the ground. He could tell that the props were placed upon dirt, and had slid out. He could see where the props had been set in the dirt; that is, the caps had first been placed on the dirt and the props had been set on the caps. He could see in the loose dirt where the props had been set and where they had slid away.

Other witnesses for the plaintiff testified that the rock which fell upon him extended from the face of the vein of coal over towards the opposite wall, which was called the "gob" wall. The rock was about seven inches thick in one place and extended out to a feather edge on the other side. It was about five feet long, and had an old crack on the side of it which extended to the gob wall. This testimony, if believed by the jury, tended to show that, on account of the old break or on account of the defective way in which the props were set upon loose

dirt, or from both conditions, the roof caved in when the plaintiff pulled out the sprags in the course of his work.

The defective condition caused by the results above stated was the direct and proximate cause of the injury to the plaintiff. He was injured by the rock falling upon him, due to the old crack in it, or to the defective manner in which the props were put up, or from the condition resulting from both of these causes. Under these circumstances the jury was warranted in returning a verdict for the plaintiff.

Finally, on this point, it is earnestly insisted that there can be no recovery in this case because the facts bring it within the rule that, where the servant adopts methods for his own convenience or safety, then the master owes the servant no duty to make the working place safe, and that his failure to do so is not actionable negligence. This contention is based on the fact that the mine workers were working under a contract which provided the method for the machine crew to do its work and for the loaders to do their work. In one of these rules it is provided that it shall be the duty of the machine crew to set such props and sprag such coal as may be necessary to make the roof reasonably safe immediately after the coal has been cut. It is true that this rule was adopted by contract between the operator and its employees, but that does not make any difference. It was still a rule prescribed for a proper method of doing the work, and it did not make any difference whether the operator adopted the rule or method of doing the work under contract with its employees or by its own volition. As we have already seen, the business of coal mining is a dangerous one, and it was the duty of the defendant to its employees to make rules necessary to insure the safety of its employees, and to inform the employees of the rules. We cannot perceive how the duty of the master in this respect can be abrogated because the master contracted with its employees to make reasonable rules. The fact that it contracted to do its duty could not make any difference. If there was any doubt about whether the rule adopted

was a reasonable one or not, in testing its reasonableness it would be proper to show that the master had adopted it at the request of its employees, or under contract with them to do so.

This suggests the question of whether or not the machine operators stood in the relation of an independent contractor to the defendant, within the rule announced in *J. H. Wheeler & Co.* v. *Fitzpatrick,* 135 Ark 117, 205 S. W. 302; *W. H. Moore Lumber Co.* v. *Starrett,* 170 Ark. 92, 279 S. W. 4; and other decisions of this court relating to this subject. The machine operators were in no sense independent contractors, and the defendant cannot be relieved of liability on that ground. They were employed by the defendant, just as the loaders were employed. They did not contract to do their work according to their own methods, but were wholly subject to the control of the defendant. It was as much their duty to obey the orders of the defendant and do their work under the rules prescribed for that purpose as it was the duty of the loaders to obey the defendant and work under its rules and directions. They had no capital invested in the mine, and were entirely dependent upon the conditions of their employment, just as the loaders were. Hence we are of the opinion that the machine operators were in no sense independent contractors.

Finally, it is insisted that the court erred in refusing to give certain instructions asked by the defendant. We do not deem it necessary to set out these instructions or to discuss them in detail. They were either peremptory in their nature or were not in accordance with the principles of law decided in the cases above cited. In the instructions given to the jury, the court fully and fairly submitted the respective theories of the parties according to the principles of law decided in the cases above referred to.

We find no reversible error in the record, and the judgment will therefore be affirmed.